WILLSON AND JACOBSON, Appellee, v. MORSE AND CLARK, C. R. MORSE AND H. G. CLARK, Appellants.

**Partnership:** *May be formed out of two partnerships.* Two partnerships may form a new partnership.

**PROOF OF ILLEGALITY:** *Burden.* Code, section 5060, provides that any partnership or individual creating any trust, pool, or combination with any other corporation, partnership, etc., to regulate or fix the price of any article of merchandise or commodity, shall be guilty of a conspiracy. *Held,* that where, in a suit for a partnership accounting, defendants claim the contract of partnership illegal under the statute, but it is not so on its face, the burden is on defendants to show the alleged illegality.

**SAME.** A firm contracted with another firm, whereby all corn and oats purchased at a certain place should be on joint account and in a suit by the members of the first firm against the other for a partnership accounting, the defense was that the contract was illegal, under Code, section 5060, as one to stifle competition. One of the defendants testified that he so understood the contract, but plaintiffs denied that they had such understanding, and it was not shown that such defendant communicated his understanding. It appeared that the parties had not always paid the same price for grain, and had at times been competitors, and that one of the defendants was the father-in-law of one of the plaintiffs, and, knowing the son-in-law's firm was of limited means, proposed the agreement. *Held,* that the evidence did not show a contract illegal under the statute.

ACCOUNTING: *Books as evidence.* In a suit for a partnership accounting, a book kept by plaintiff showing purchases by him under the partnership contract was not admissible in the absence of identification and proof of its genuineness.

*Same.* In a suit for a partnership accounting, statements from a book kept by plaintiff showing purchases by him under the partnership agreement were not admissible where the book was not in evidence.

*Appeal from Poweshiek District Court.*—HON. A. R. DEWEY, Judge.

THURSDAY, OCTOBER 16, 1902.

SUIT in equity for a partnership accounting. Defendants pleaded the illegality of the partnership agreement, and an abandonment thereof. The trial court rendered a decree for the plaintiff, and defendants appeal.—*Affirmed.*

*Haines & Lyman* for appellants.

*Binford & Snelling, W. R. Lewis* and *D. W. Norris,* for appellee.

DEEMER, J.—On the 23d day of September, 1895, the parties to this litigation entered into the following written agreement: "This contract and agreement made and entered into this 23d day of September, 1895, by Willson & Jacobson and Morse & Clark, of Grinnell, Iowa, witnesseth that said parties hereby contract and agree that all the corn and oats purchased at Grinnell, Iowa, of the crop of 1895, shall be on joint account, at actual purchase price. Should either party have more invested than the other, the interest shall be adjusted and charged to the account of the cost of the grain. All moneys paid for oats shall be charged to oats account, and all moneys paid for corn shall be charged to corn account. Both parties shall share alike in the loss or gain on the entire purchase and sale. Willson & Jacobson contract

and agree to ship from Gilman, Iowa, forty thousand bushels of oats, and put into the joint account at 16¼ cents per bushel. All subsequent shipments shall be at cost. [Signed] Willson & Jacobson. Morse & Clark." It is claimed by appellees that this contract was carried out, and that they have not had their share of the resulting profits, which they say amounted to more than $3,500. The defendants pleaded that the contract was contrary to public policy, and in contravention of section 5060 of the Code, relating to pools, combinations, and trusts; that the contract was abandoned and annulled in November, 1896; and that, in any event, the trial court was in error in its computation of the profits. With reference to the first point, we cannot do better than quote from appellant's argument as follows: "It is not contended that the illegality so appears on the face of the contract that a demurrer to the petition on the grounds that the contract was shown to be illegal could have been sustained. Some of the facts which show the illegality of the contract had to be shown by the evidence, and were properly pleaded, we think, in the answer; and this evidence, as it appears in the abstract, will be alluded to later in this paragraph. Section 5060 of the Code provides 'that any partnership, association or individual creating or entering into, or becoming a member of or a party to any trust, pool, agreement, contract, combination, confederation, or understanding with any other corporation, partnership, association or individual, to regulate or fix the price of any article of merchandise or commodity, * * * shall be guilty of a conspiracy,' and by the terms of a subsequent section such parties are made liable to a fine and imprisonment. The defendants contend that the contract in suit is entirely within the terms and spirit and purpose of this section of the statute. But if in any respect it fails to come within the letter of the statute, they still contend that the contract at the time it was made was contrary to public policy and void,

as tending to create a monopoly." That two partnerships, or a partnership and an individual, may enter into a new partnership, seems to be conceded. Indeed, in the face of the authorities, that proposition could not well be denied. See Parsons Partnership, section 25, and cases cited. It is also conceded, or at least not denied, that the agreement quoted creates a partnership between the two parties. Even if denied, the cases leave the question in no doubt. *Winter v. Pipher*, 96 Iowa, 21. Hence we suppose the concession by appellants' counsel that the contract, on its face, is not illegal. To establish its illegality, defendants rely on the testimony of Morse to the effect that the contract was entered into for the purpose of stifling competition, and to fix and control the price that should be paid for the corn and oat crop of the year 1895. It may be said, in passing, that, if this was the purpose of the parties, it was not carried out; for they did not pay the same prices for the grain, and they were at times, at least, in active competition. But to return to the point under consideration. The contract being legal on its face, the burden was on defendants to show its illegality by satisfactory and convincing evidence. If made to prevent competition, or to fix the price to be paid for grain in the territory where it was to be operative, it was, of course, contrary to public policy and void, or if, in the language of the statute quoted from appellants' brief, it was "to regulate or fix the price of any article of merchandise or commodity," it cannot be enforced. Whether the parties had in mind either of these purposes is a question of fact to be determined from the evidence. That defendant Morse had one or the other or both of these in mind must be accepted as true, for he so testified in the case. But he does not say that he communicated his purpose to plaintiffs, or that they had any knowledge thereof. Ordinarily such a contract would be treated with suspicion, but, as applied to the facts shown

by the record before us, that suspicion is removed by the unequivocal testimony of the plaintiffs, supported in some degree by the relationship existing between the parties, as well as by their conduct after the contract was entered into. Wilson, of the plaintiff firm, was a nephew of Morse's first wife; and Clark, of the defendant firm, is Morse's son-in-law. This son-in-law had had no experience in the grain business, but plaintiffs had had years of experience therein. Morse was anxious to induct his son-in-law into that business, and, knowing that plaintiffs' firm was of limited means, proposed to them that they all enter. into a partnership for the purchase of the large corn crop of the year 1895. Morse was not able to give the business personal attention, but proposed to take care of the financial end of it. The negotiations culminated in Morse's drawing up the contract which is the basis of this suit, which was signed by all the parties, and confessedly acted upon down until November of the year 1896. It does not sufficiently appear that the contract was illegal. On the contrary, we are constrained to hold that it was entered into and executed for a proper and legitimate purpose, and that, while Morse may have thought that by such an arrangement he could control the local market, there was no intent to stifle competition, except as consolidation of the two firms would effectuate that purpose.

II. The issue as to revocation or annulment of the contract as claimed by the defendants is purely one of fact, to be determined from the evidence before us. Here, again, we have the testimony of Morse directly contradicted by that of the two persons who make up the plaintiff firm. There are some circumstances which in a measure at least, tend to corroborate Mores's version of the affair, but the great preponderance of the evidence is with the plaintiffs. The relationship of the parties is an important item to be considered in viewing conduct which under other circumstances might be treated as controlling. Relatives

rarely deal with each other on the same basis as those who
are not bound by ties of relationship. They are not
so particular and punctilious. With this in mind, it is
not hard to account for plaintiffs' assumed delay in asking
for a settlement of the partnership business. The deal
was not finally closed until nearly three years after the
contract was entered into, and within a short time after
the last of the crops were disposed of a settlement was de-
manded by plaintiffs. Then it was, according to their tes-
timony, that they first heard of the proposed claim of
abandonment. At the time of the alleged abandonment
considerable grain had been purchased for the new firm,
and a settlement of its affairs, even if there was an aban-
donment, was necessary. No such settlement was made,
and Morse never demanded any. His delay in demanding
one is as difficult to explain, in the light of his evidence,
as plaintiffs' is on their theory of the case. The alleged
abandonment has not been proven.

III. Having now arrived at the question as to the
amount due plaintiffs, we find more difficulty than with
the other matters in issue, because of the unsatisfactory
condition of the record. Aside from a book which is not
properly identified, the evidence is largely made up
of estimates, from which it is difficult to arrive at a
satisfactory conclusion. • Defendants introduced
statements from a book said to have been kept by the firm,
showing the amount of corn and oats purchased by it under
the contract, but the book itself was not offered in evi-
dence. See valuable note on this subject in *Chick v. Rob-
inson*, 52 L. R. A. 833 (s. c. 37 C. C. A. 205, 95 Fed. Rep.
619). If offered, the proper preliminary proof was not
made to justify its reception as evidence. These state-
ments, in the absence of the book itself, were not compe-
tent; and the book, unless properly identified, and its gen-
uineness established, was not admissible. We have,
therefore, to rely on the estimates made by the various

witnes·es, and the showing as to grain shipped from Grin-
nell, with the testimony as to the selling price for the
grain. · This, of course, is not as satisfactory as it might be,
but it is the best evidence obtainable.  From this evidence
we are constrained to hold that the conclusion reached by
the trial judge is as nearly correct as it is possible to ar-
rive at.   This  we  approve  as the best  approximation
obtainable.                   ·          ,'

On the whole, the decree seems to be correct, and it is
*Affirmed.*